**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RAFAEL MAZUZ,

*Plaintiff-Appellee,*

v.

THE STATE OF MARYLAND; PHILIP P.
TOU,

*Defendants-Appellants.*

No. 05-1463

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-04-1067-PJM)

Argued: November 29, 2005

Decided: March 29, 2006

Before WIDENER and SHEDD, Circuit Judges, and
Walter D. KELLEY, Jr., United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Vacated and remanded by published opinion. Judge Shedd wrote the
opinion, in which Judge Widener and Judge Kelley joined. Judge Kel-
ley wrote a separate concurring opinion.

_____

## COUNSEL

**ARGUED:** Dawna Marie Cobb, Assistant Attorney General, OFFICE
OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore,
Maryland, for Appellants. William James Mertens, Bethesda, Mary-

land, for Appellee. **ON BRIEF:** J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellants.

---

**OPINION**

SHEDD, Circuit Judge:

While executing a search warrant in a University of Maryland, College Park, dormitory during a multi-room drug raid, university police detective Philip Tou and other law enforcement officers mistakenly entered the wrong room and briefly detained the residents of that room, one of whom was Rafael Mazuz. Upon realizing the mistake, the officers immediately released the residents and left the room. Mazuz subsequently filed this lawsuit asserting a cause of action against Tou under 42 U.S.C. § 1983 for violating his Fourth Amendment right to be free from unreasonable search and seizure, unlawful arrest and detention, and the use of excessive force. Mazuz also asserted an identical cause of action against Tou under Article 26 of the Maryland Declaration of Rights. Tou moved for summary judgment on both causes of action arguing that no constitutional violation occurred and that he is entitled to qualified immunity. The district court denied the motion, and Tou now appeals. For the reasons set forth below, we vacate the district court's order and remand for further proceedings consistent with this opinion.[1]

I

In May 2002, Mazuz was a student at the University of Maryland, College Park. Mazuz and a roommate resided in room 5108 of Ellicott Hall, which is a university dormitory. Tou was employed by the university police department and was assigned by the university to serve on a multi-jurisdiction drug task force. In this capacity, Tou conducted drug investigations on the university campus. Tou had been

---

[1]Mazuz also asserted several tort causes of action against the State of Maryland. The district court granted summary judgment in the State's favor on these claims. The claims against the State are not now before us, and we need not address them further.

employed by the university police department for several years, and he had obtained and executed over 100 search warrants, many of which were for campus dormitory rooms. Mazuz and Tou did not know one another.

In early May, Tou received information concerning the sale of illegal drugs on campus. Tou's investigation revealed that several of the students involved in this drug activity resided in Ellicott Hall. Among other information, Tou learned that in late April an armed robbery of drugs from a resident of Ellicott Hall room 5107 had occurred. Tou also learned that one of the students involved in this drug activity had stated to an informant that he possessed a knife and intended to use it against any police officer who confronted him.[2]

Based on his investigation, Tou subsequently applied for and obtained search warrants for Ellicott Hall rooms 5105 and 5110, and arrest warrants for students residing in Ellicott Hall rooms 5105 and 5107. Before obtaining the warrants, Tou visited the fifth floor of Ellicott Hall and observed the exterior of rooms 5105, 5107, and 5110. Tou also confirmed with university officials the identity of the residents of these rooms. Neither Mazuz nor his roommate was a suspect in any of the drug activity, and the validity of the warrants is not at issue.

On May 15, Tou prepared an "Operational Plan" for the execution of the arrest and search warrants on the fifth floor of Ellicott Hall. J.A. 43-46. At approximately 10:00 p.m. that evening, Tou met with other officers at the university police station and planned for the raid. Tou reviewed with the officers the information uncovered during his investigation and the floor plan for Ellicott Hall, and the officers were assigned specific duties for the raid. Tou, along with one or more officers, was assigned to enter room 5110. The officers then drove from the police station to Ellicott Hall. Consistent with his normal practice to show warrants to suspects only after a scene has been secured, Tou left the warrants in his vehicle when he arrived at Ellicott Hall.

---

[2]This student had purportedly "punched a police officer's horse" during the riot which occurred after the university's men's basketball team won the NCAA championship in late March. J.A. 40.

Although Tou was designated as the lead investigator, his immediate supervisor accompanied the officers on this raid.

The search warrant for room 5110 (and presumably the other warrants) authorized nighttime execution, and Tou believed that the likelihood of finding evidence in the rooms was greater at night. At approximately 10:30 p.m., Tou and seven or eight other officers entered Ellicott Hall and took an elevator to the fifth floor. The officers exited the elevator and proceeded down the hallway at a quick pace. From the officers' location, room 5110 was halfway down the hall from the elevator on the right side, room 5108 was immediately past room 5110, and rooms 5105 and 5107 were further down the hall on the left side. Tou moved down the hall staying close to the wall on the right side so that other officers could pass him on the left side. The plan for the raid called for simultaneous entry into the three rooms. Tou reached room 5110 ten to fifteen seconds after exiting the elevator.

The room numbers in Ellicott Hall are not located on the room doors. Instead, they are located on the wall to the upper left of each doorway. Tou was familiar with this numbering system, and he also had reviewed the warrant for room 5110 during the pre-raid meeting. The warrant for room 5110 correctly described the location of the number for the room.

As Tou approached room 5110, which he understood was the room he was supposed to enter, he remained close to the wall. From this vantage point, Tou could not view the room numbers on the wall until he was close to the rooms because the numbers were obstructed by the doorway frames. When Tou viewed the number 5110, he mistakenly associated it with the door to room 5108, which was next to room 5110. The number 5110 is between rooms 5108 and 5110, but it is closer to the door for room 5110. Believing that room 5108 was in fact room 5110, Tou focused his attention on the door to room 5108, and he and another officer moved into position on the sides of that door. At that time, the number 5108 was immediately above Tou, but he did not see it. Nothing in the record suggests that the actual doors of rooms 5108 and 5110 differ in any material respect.

Tou knocked on the door to room 5108 and announced his presence for the purpose of executing a search warrant. Tou then drew his

weapon. Mazuz and his roommate were in room 5108, and Mazuz was studying for an examination to be given the following morning. Hearing the knock on the door and believing that another student was outside his room, Mazuz opened the door to find Tou's firearm pointed directly at him. Tou and one or more armed officers entered the room, loudly ordered Mazuz and his roommate to get on the floor, and handcuffed them. Tou was dressed in black "battle dress uniform," which included a black t-shirt, raid vest, and gun belt, and he had some form of clothing over his head or face. J.A. 212. Quite naturally, Mazuz and his roommate were unnerved by the officers' entry into their room, and they attempted to ascertain what was happening and to explain that a mistake had been made. The officers told them to "shut up." J.A. 69. The room was filled with shouting.

Shortly after entering room 5108, Tou became aware that something was amiss. Tou thus went into the hall and checked the room number. At that time, Tou realized that the officers had mistakenly entered room 5108 rather than room 5110, and he informed the other officers of this fact. The officers uncuffed Mazuz and his roommate and went to room 5110 to execute the search warrant. The entire incident involving room 5108 lasted "one to two minutes." J.A. 82. Although the officers "pushed or shoved" some of Mazuz's belongings near the doorway for a few seconds, J.A. 115, they did not physically search Mazuz, his roommate, or the room itself.

Mazuz was understandably upset by this incident, and he therefore attempted (without success) to be excused from his examination the following morning. Because of anxiety resulting from the incident, Mazuz scored poorly on the examination; consequently, he received a poor letter grade for the course. Mazuz has since been diagnosed as suffering from post-traumatic stress disorder.

Mazuz has presented a report from his expert witness, Dr. Wendell M. France, who opined (among other things) that "the execution of the search and seizure warrants at Ellicott Hall . . . was a disjointed, poorly managed initiative," and that Tou "disregarded" Mazuz's rights "by failing to ensure a copy of the warrant was in hand to prevent the armed, forced entry of . . . room #5108." J.A. 313. Dr. France specifically pointed to a State police policy that provides, in pertinent part, that when executing a search warrant "[t]he entry team leader,

along with the task force/unit supervisor, is responsible for reading the description of the location to be searched and compare the description to the location being entered." J.A. 339.

For his part, Tou testified during discovery that he had never seen this policy. Tou also testified that the manner in which the warrant for room 5110 was executed is consistent with the normal practice of the drug task force. However, Tou acknowledged that if he had compared the description in the warrant with the doorway immediately before he entered room 5108 he "probably" would not have entered that room. J.A. 195.

II

As we have noted, Mazuz has asserted a claim under 42 U.S.C. § 1983, alleging that Tou violated his Fourth Amendment right to be free from unreasonable search and seizure, unlawful arrest and detention, and the use of excessive force. Mazuz has also asserted an identical cause of action based on Article 26 of the Maryland Declaration of Rights which, as we discuss below, is generally construed "*in pari materia*" with the Fourth Amendment. *See Fitzgerald v. State*, 864 A.2d 1006, 1019 (Md. 2004).[3]

In moving for summary judgment, Tou argued that the Fourth Amendment is violated only by unreasonable conduct and that his mistaken entry into Mazuz's room was reasonable under the circumstances. For this reason, Tou contended that he did not violate the Fourth Amendment or Article 26. Tou further argued that he is entitled to qualified immunity on the § 1983 cause of action because the law was not clearly established in 2002 that his actions violated the Fourth Amendment and because he acted in good faith. Tou also argued that he is entitled to qualified immunity on the Article 26 claim because he did not act with malice or gross negligence.

---

[3]Mazuz asserted these causes of action together in Count VII of the complaint, which is titled "Violation of Constitutional Rights: 42 U.S.C. § 1983." J.A. 17. Mazuz's Article 26 claim arises under Maryland common law. *See Widgeon v. Eastern Shore Hosp. Ctr.*, 479 A.2d 921, 930 (Md. 1984).

Describing the issue as a "close call," J.A. 401, the district court denied Tou's motion in an oral order. After recounting much of the evidence set forth above, the district court held that the law was clearly established in 2002 that a law enforcement officer could not enter a premises without proper authorization. Therefore, the district court reasoned, the issue "is really a question of whether analyzing the acts in question a reasonable trier of fact could conclude that what [Tou] did . . . was objectively unreasonable," J.A. 400, and it answered this question in the affirmative:

> The plaintiff's argument . . . is not unreasonable in the sense that [Tou] had been there the week before and should have known better. He knew where the numbers were. He scoped it out to see exactly where they were.
>
> He described the door in detail to get the warrant. He did not have the warrant with him when he came in that evening and indeed he says on deposition, that "maybe if I had had that warrant in hand, I would have seen and not gone in." And I think that's enough, frankly, to raise a question of material fact in this case. It squeaks by.
>
> Not to say that the plaintiff prevails in this case ultimately, but a jury will decide whether or not there was objective unreasonableness in this case. As I say, no issue of qualified immunity here really, because it is well established that one doesn't enter into a premises where one doesn't have a warrant.
>
> So this is really a question of whether on these particular facts there was objectively reasonable or unreasonable behavior and a trier of fact could differ on that. So the motion as to count seven, which is the 1983 claim . . . and the Article 26 state claim is denied.

J.A. 402 (quotation marks added). In making this ruling, the district court stated that it was unnecessary to rule specifically on Mazuz's claim of excessive force; therefore, it expressly refrained from doing so.

On appeal, Tou reiterates the arguments that he made in the district court. As we explain more fully below, we conclude that the district court erred in denying the summary judgment motion on the § 1983 and Article 26 claims because the specific undisputed evidence in this case establishes as a matter of law that Tou acted reasonably.

III

A.

We begin with the § 1983 claim, which is grounded on Tou's alleged violation of Mazuz's Fourth Amendment rights. The Fourth Amendment guarantees the "right of the people to be secure in their persons [and] houses . . . against unreasonable searches and seizures." The "central concern of the Fourth Amendment is to protect liberty and privacy from arbitrary and oppressive interference by government officials." *United States v. Ortiz*, 422 U.S. 891, 895 (1975). Under the Fourth Amendment, a "search" occurs "when an expectation of privacy that society is prepared to consider reasonable is infringed," *United States v. Jacobsen*, 466 U.S. 109, 113 (1984), and a "seizure" occurs "when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business," *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (per curiam) (citations and internal punctuation omitted).

"The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "Whether a Fourth Amendment violation has occurred turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (internal citation and punctuation omitted). This is a fact-specific inquiry. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). "[I]n order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable." *Illinois v. Rodriguez*, 497 U.S. 177, 185-86

(1990). Elaborating on this point, the Court has stated: "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

The "purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). Section 1983 allows a plaintiff "to seek money damages from government officials who have violated his Fourth Amendment rights," *Wilson v. Layne*, 526 U.S. 603, 609 (1999), but it "does not purport to redress injuries resulting from reasonable mistakes," *McLenagan v. Karnes*, 27 F.3d 1002, 1008 (4th Cir. 1994).

B.

In response to the § 1983 claim, Tou has asserted the defense of qualified immunity, which shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When a government official asserts qualified immunity as a defense, "the requisites of [the] defense must be considered in proper sequence." *Saucier v. Katz*, 533 U.S. 194, 200 (2001). The threshold question that a court must first answer is whether the facts, when viewed in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. *Id.* at 201. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.* However, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established;" that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201, 202.

"In reviewing the denial of summary judgment based on qualified immunity, we accept as true the facts that the district court concluded may be reasonably inferred from the record when viewed in the light most favorable to the plaintiff. To the extent that the district court has not fully set forth the facts on which its decision is based, we assume the facts that may reasonably be inferred from the record when viewed in the light most favorable to the plaintiff." *Waterman v. Batton*, 393 F.3d 471, 473 (4th Cir. 2005) (internal footnote and citations omitted).[4]

Applying the foregoing standard, we begin our analysis by answering the threshold question of whether the facts presented in the summary judgment record, when viewed in the light most favorable to Mazuz, show that Tou violated Mazuz's Fourth Amendment right to be free from unreasonable search and seizure, unlawful arrest and detention, or the use of excessive force. We believe that under the specific circumstances of this case this question must be answered in the negative.

## C.

The genesis of the alleged Fourth Amendment violations in this case, and the focus of the district court's order, is Tou's entry into Mazuz's room. Tou does not dispute that his entry into Mazuz's room constitutes a Fourth Amendment "search," and it is undisputed that he did not have a warrant to enter this particular room. Viewed in isolation, Tou's entry into Mazuz's room has the appearance of a Fourth Amendment violation because "[w]ith few exceptions, the question

---

[4]We have jurisdiction to review "final decisions" of district courts, 28 U.S.C. § 1291, and "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of . . . § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). As we explained in *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc), "we possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred, but we have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them."

whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31 (2001). However, relying primarily on *Hill v. California*, 401 U.S. 797 (1971), and *Maryland v. Garrison*, 480 U.S. 79 (1987), Tou contends that his entry into Mazuz's room was nonetheless "reasonable" because he had a valid warrant to enter room 5110, and he simply made an honest mistake based on his observation and perception of the room number as the raid unfolded. We agree.

In *Hill*, the police had probable cause to arrest a man named Hill. When they arrived at Hill's apartment, they encountered a man named Miller in the apartment. Despite Miller's presentment of identification and protestation, the police believed in good faith that Miller was Hill, and they arrested him. During a search of Hill's apartment following Miller's arrest, police found contraband that was subsequently used against Hill at a criminal trial. Hill was convicted, and his conviction was upheld by the state courts.

The Supreme Court likewise sustained Hill's conviction. In doing so, the Court rejected Hill's assertion that the arrest of Miller (which led to the search of Hill's apartment) was invalid, holding that "when the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." *Hill*, 401 U.S. at 802 (citation omitted and internal punctuation altered). Explaining this holding, the Court stated:

> The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.

*Id.* at 803-04. Turning then to the validity of the search of Hill's apartment, the Court also rejected Hill's assertion that the search was invalid regardless of the validity of Miller's arrest. After noting that

"there was probable cause to arrest Hill and the police arrested Miller in Hill's apartment, reasonably believing him to be Hill," the Court held that "[i]n these circumstances the police were entitled to do what the law would have allowed them to do if Miller had in fact been Hill, that is, to search incident to arrest and to seize evidence of the crime the police had probable cause to believe Hill had committed." *Id.* at 804.

In *Garrison*, the police obtained and executed a valid warrant to search the person of a man named McWebb and "'the premises known as 2036 Park Avenue third floor apartment.'" 480 U.S. at 80. When the police obtained and executed the warrant, they reasonably believed (based on their pre-search investigation) that there was only one apartment on the third floor of 2036 Park Avenue. There were, however, two apartments on the third floor: one occupied by McWebb and one occupied by Garrison. Before the police realized that there were two apartments on the third floor, they had entered Garrison's apartment and observed contraband. Garrison was charged and convicted based on this contraband, but his conviction was reversed by the Court of Appeals of Maryland based on the grounds that the search of his apartment and the seizure of the contraband was unconstitutional. In reaching this decision, the court relied on Article 26 and, because of the "*in pari materia*" construction, the Fourth Amendment. *Id.* at 83-84.

Applying Fourth Amendment principles, the Supreme Court reversed. After concluding that the warrant itself was valid, the Court considered the "question whether the execution of the warrant violated [Garrison's] constitutional right to be secure in his home." *Id.* at 86. The Court noted that although "the purposes justifying a police search strictly limit the permissible extent of the search," there is also "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants." *Id.* at 87. The Court stated that its rationale in *Hill* "that an officer's reasonable misidentification of a person does not invalidate a valid arrest is equally applicable to an officer's reasonable failure to appreciate that a valid warrant describes too broadly the premises to be searched," and that "the validity of the search of [Garrison's] apartment pursuant to a warrant authorizing the search of the entire third floor depends on whether the officers' fail-

ure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 87-88. The Court concluded that it was "objectively understandable and reasonable" because the "objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises." *Id.* at 88. Notably, the Court observed that the officers properly recognized that "they were required to discontinue the search of [Garrison's] apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant." 480 U.S. at 87.[5]

The material facts in this case are undisputed. Tou had a valid warrant to enter and search room 5110, which is immediately next door to Mazuz's room (5108) on the fifth floor of Ellicott Hall. Before obtaining the warrant, Tou visited Ellicott Hall to locate and identify room 5110 (as well as the other two rooms that were under investigation), and he correctly identified room 5110 on the warrant application. On the night of the raid, Tou reviewed with the other officers the plan for the raid and correctly identified room 5110 as the room he was to search. The plan called for simultaneous entry into three rooms on the fifth floor, and the officers had information that indicated that they could encounter armed resistance. As the raid unfolded, Tou and a number of other officers moved quickly down the fifth floor hall-

---

[5]In *United States v. Patterson*, 278 F.3d 315 (4th Cir. 2002), we applied *Garrison* to uphold the validity of a search of a vehicle that officers executing a search warrant mistakenly believed was on the property that was the subject of the warrant (the "Patterson property"). The vehicle — which belonged to Patterson — was on a gravel parking area that abutted the street and the Patterson property, and this gravel area — which police had observed Patterson routinely use — was actually city property. During the search of the Patterson property, the officers searched the vehicle and discovered contraband which later led to a criminal charge being filed against Patterson. Following Patterson's conviction, we affirmed the district court's denial of his motion to suppress this contraband. Relying on *Garrison*, we held that "because the agents' belief that the gravel parking area was part of the Patterson property was an objectively reasonable one, their interpretation of the scope of the warrant to include Patterson's vehicle, which was parked there, was also objectively reasonable." 278 F.3d at 319.

way, and Tou stayed close to the right wall in order to allow other officers to pass by on his left. During this entire time, Tou correctly understood that he was to enter room 5110. However, from his vantage point, Tou mistakenly associated the room number 5110 (which was on the wall between rooms 5110 and 5108) with the door to room 5108, and in the quickly unfolding circumstances, he and other officers entered room 5108. The officers were in Mazuz's room for a relatively brief period of time, and they left immediately upon realizing the mistake.

The district court concluded that these undisputed facts present a "close" jury question concerning the reasonableness of Tou's entry into Mazuz's room. J.A. 401. However, given "the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants," *Garrison*, 480 U.S. at 87, we believe that these *specific* undisputed facts establish as a matter of law that Tou's "mistake was understandable and the [search] a reasonable response to the situation facing [him] at the time," *Hill*, 401 U.S. at 804. Therefore, we hold that Tou's entry into Mazuz's room — *i.e.*, the "search" — does not constitute a Fourth Amendment violation.

The district court grounded its contrary conclusion primarily on two factors. First, the district court noted that because Tou had been on the fifth floor hallway before the raid and observed the exterior of rooms 5108 and 5110, he "should have known better" on the night of the raid. J.A. 402. Second, the district court attached great significance to the fact that Tou did not carry the warrant with him when he began the search, pointing out that Tou acknowledged that he "probably" would not have entered Mazuz's room if he had carried the warrant and examined it while he was in the hallway. Although there may be a certain superficial appeal to these observations, we do not believe that under the circumstances of this case they create an issue of whether Tou acted reasonably for Fourth Amendment purposes.

Regarding the former observation, we believe that the district court is implicitly penalizing Tou for doing what appears to be a natural, and likely necessary, law enforcement function — that is, visiting Ellicott Hall as part of his investigation to identify the rooms that

were the subject of the warrants. Of course, when Tou later returned to execute the warrants, he mistakenly entered Mazuz's room. In stating that Tou "should have known better" than to make this mistake, the district court implicitly suggests that Tou would have been better off in this litigation if he had never visited Ellicott Hall before the night of the raid. In other words, under the district court's view, Tou's mistaken entry into Mazuz's room may have been more reasonable had he not "known better." We cannot agree with this suggestion. *Cf. United States v. Ventresca*, 380 U.S. 102, 111-12 (1965) (noting that although the Court "is alert to invalidate unconstitutional searches and seizures," it is "equally concerned to uphold the actions of law enforcement officers consistently following the proper constitutional course").

Concerning the fact that Tou did not carry the warrants with him during the actual raid, we note initially that the Fourth Amendment does not require that an officer executing a search must physically possess the warrant at the commencement of the search. *See United States v. Bonner*, 808 F.2d 864, 869 (1st Cir. 1986) ("Courts have repeatedly upheld searches conducted by law enforcement officials notified by telephone or radio once the search warrant issued."); *cf. Groh v. Ramirez*, 540 U.S. 551, 562 n.5 (2004) (noting that "neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search"). In any event, it is undisputed that Tou knew at all times during the raid that the warrant authorized him to enter room 5110; indeed, he thought he was entering room 5110 when he entered room 5108. Thus, this is not a case where an officer's failure to review the warrant mistakenly caused him to believe that he had the authority to enter a premises not identified on the warrant.[6] Although Tou conceded that he "probably" would not have entered Mazuz's room had he stopped in the hallway outside the target rooms and reviewed the warrant during the raid, his decision not to review the warrant in this manner in the circumstances of this case — where the officers were in a relatively close area executing

---

[6]Tou's failure to possess the warrant during the raid arguably would have more significance if, in fact, he had knowingly entered room 5108 under the mistaken belief that the warrant authorized entry into that room rather than room 5110.

multiple arrest and search warrants for different rooms and with information of potential resistance — is by no means unreasonable. *See Terry v. Ohio*, 392 U.S. 1, 23 (1968) (noting that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties").[7]

D.

Having determined that Tou's entry into Mazuz's room did not violate the Fourth Amendment, we now turn to Mazuz's claim that he was subjected to an unreasonable seizure, an unlawful arrest and detention, and the use of excessive force. As with the search issue, Tou does not contend that he did not "seize" Mazuz for purposes of the Fourth Amendment. Rather, Tou argues that the seizure was not unreasonable because it was made during the normal course of the execution of the warrant.

Generally, a Fourth Amendment "seizure" may take the form of an "arrest" or a "detention." *See United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) ("The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest."). When a warrant authorizes a law enforcement officer to enter a premises to conduct a search, the warrant "implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705. "Inherent in [the] authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention," including the use of handcuffs. *Muehler v. Mena*, 544 U.S. 93, 125 S. Ct. 1465, 1470 (2005). This detention is a "seizure" under the Fourth Amendment, but it is not necessarily an "ar-

---

[7]The Court has noted that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence," *Michigan v. Summers*, 452 U.S. 692, 702 (1981), and that "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant - subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures,'" *Dalia v. United States*, 441 U.S. 238, 257 (1979) (internal footnote omitted).

rest." *See Summers*, 452 U.S. at 696 (recognizing distinction between "pre-arrest 'seizure'" and "formal[ ]" arrest).

Despite the manner in which Mazuz framed his claim in his complaint (*i.e.*, an unreasonable seizure, unlawful arrest and detention, and the use of excessive force), he has not argued that he was actually arrested, and we find nothing in the record to support such an allegation. We shall therefore examine Mazuz's claim as one for an unreasonable seizure. In doing so, we recognize that Mazuz's claim of excessive force is governed by the Fourth Amendment's prohibition against unreasonable seizures, *Chavez v. Martinez*, 538 U.S. 760, 773 n.5 (2003), and is to be analyzed under the Fourth Amendment reasonableness standard, *Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that all "claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard").[8]

We conclude that the seizure of Mazuz was reasonable under the undisputed facts of this case. As we have previously held, although the warrant did not authorize Tou to enter Mazuz's room to conduct a search, his mistaken entry into Mazuz's room was reasonable under the Fourth Amendment. We believe, as the Court held in *Hill*, that in this circumstance once Tou entered Mazuz's room he was "entitled to do what the law would have allowed [him] to do" if he had entered the correct room. 401 U.S. at 804. Accordingly, we hold that it was not unreasonable for Tou to detain (and handcuff) Mazuz when he entered his room. This brief detention was an appropriate measure incident to the search, there is no evidence that any excessive force was used during the detention, and the detention ended as soon as the officers discovered their mistake.

---

[8]From the record, it seems clear that Mazuz's excessive force claim primarily hinges on whether Tou's entry into room 5108 was reasonable. *See* J.A. 379 (Mazuz's counsel: "the core of [the excessive force claim] is that under the circumstances of this, any force against Mr. Mazuz would be unreasonable"). Although the parties dispute (for different reasons) whether this claim is properly before us, we conclude that a fair reading of the record shows that it is, and the district court's failure to specifically address it does not preclude our consideration of it. *See Garraghty v. Commonwealth*, 52 F.3d 1274, 1284 & n.8 (4th Cir. 1995).

E.

In short, we hold that Tou did not violate the Fourth Amendment by entering Mazuz's room and seizing Mazuz. Therefore, Mazuz's § 1983 claim must fail. In light of this determination, there is "no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

IV

We now turn to Tou's appeal of the denial of his motion for summary judgment on the Article 26 claim. As we have noted, Article 26 is generally construed *in pari materia* with the Fourth Amendment. *Fitzgerald*, 864 A.2d at 1019. The Court of Appeals of Maryland has used this method of construction "essentially to equate the Federal and State provisions, notwithstanding their very different language, and to construe the Maryland provision in conformance with constructions given to the Fourth Amendment by the Supreme Court." *Scott v. State*, 782 A.2d 862, 873 n.2 (Md. 2001) (citation omitted).

Although, theoretically, the resolution of claims under the Fourth Amendment and Article 26 can differ, *see Davis v. State*, 859 A.2d 1112, 1120 (Md. 2004) (citations omitted) (noting that the provisions have "a like, though perhaps not identical, purpose and effect, to prohibit unlawful searches and seizures," and generally are "subject to a like, but not identical, interpretation"), we discern no basis in this record or under Maryland law to support a different construction of these provisions. *See Garrison*, 480 U.S. at 83-89 (applying Fourth Amendment principles to Article 26 unreasonable search claim); *Richardson v. McGriff*, 762 A.2d 48, 56 (Md. 2000) (applying Fourth Amendment excessive force standard to Article 26 claim); *see also Robles v. Prince George's County, Md.*, 302 F.3d 262, 269 n.1 (4th Cir. 2002) (in affirming denial of Fourth Amendment claim, we also held that "[b]ecause Article 26 . . . and the Fourth Amendment . . . parallel each other, the jury verdict for the defendants on [the Article 26] claim must stand"). Therefore, we conclude that our disposition of Mazuz's § 1983 claim dictates the same result on his Article 26 claim. Accordingly, Tou is entitled to summary judgment on this claim.[9]

---

[9]We have appellate jurisdiction over the Article 26 claim because it is "inextricably intertwined" with the district court's denial of qualified

V

Based on the foregoing, we vacate the district court's order denying Tou's motion for summary judgment and remand this case for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

KELLEY, District Judge, concurring:

I am pleased to join in the majority's well-reasoned opinion holding that Officer Tou did not violate Mazuz's Fourth Amendment right to be free from unreasonable search and seizure, unlawful arrest and detention, or the use of excessive force. I write separately only to emphasize the proper roles of the court and the jury in deciding claims of qualified immunity.

In denying defendants' Motion for Summary Judgment, the district court stated:

> The plaintiff's argument . . . is not unreasonable in the sense that [Tou] had been there the week before and should have known better. He knew where the numbers were. He scoped it out to see exactly where they were.

> He described the door in detail to get the warrant. He did not have the warrant with him when he came in that evening and indeed he says on deposition, that "maybe if I had had that warrant in hand, I would have seen and not gone in."

---

immunity on the § 1983 claim. *See Taylor v. Waters*, 81 F.3d 429, 437 (4th Cir. 1996) (holding that jurisdiction to consider an interlocutory appeal of the denial of qualified immunity provides a basis for consideration of other district court ruling if that ruling is "inextricably intertwined with the decision of the lower court to deny qualified immunity"); *Altman v. City of High Point, N.C.*, 330 F.3d 194, 207 n.10 (4th Cir. 2003) (holding that claims are "inextricably intertwined" where the resolution of one claim necessarily resolves the other claim).

*And I think that's enough, frankly, to raise a question of material fact in this case*. It squeaks by.

Not to say that the plaintiff prevails in this case ultimately, *but a jury will decide whether or not there was objective unreasonableness in this case*. As I say, no issue of qualified immunity here really, because it is well established that one doesn't enter into a premises where one doesn't have a warrant.

So this is really a question of whether on these particular facts there was objectively reasonable or unreasonable behavior *and a trier of fact could differ on that*. So the motion as to count seven, which is the 1983 claim . . . and the Article 26 state claim is denied.

J.A. 402 (quotation marks and emphasis added).

As the quoted language makes clear, the district court planned to submit to a jury the issue of Officer Tou's objective reasonableness in entering Room 5108 and restraining its occupants. This is an incorrect apportionment of decision-making responsibility. Whether an officer's conduct was objectively reasonable, and hence protected by qualified immunity, is a question of law solely for the court. *Willingham v. Crooke*, 412 F.3d 553, 559-60 (4th Cir. 2005); *see Knussman v. Maryland*, 272 F.3d 625, 634 (4th Cir. 2001). Only disputed issues of fact material to the court's objective reasonableness decision are submitted to the jury. *Willingham*, 412 F.3d at 559-60; *see Knussman*, 272 F.3d at 634. The court then uses the jury's factual findings, typically communicated in the form of answers to special interrogatories, to decide whether to grant qualified immunity. *Willingham*, 412 F.3d at 560; *see Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990) ("If there are unresolved factual issues . . . the jury should decide these issues on special interrogatories . . . .").*

---

*The district court's misapprehension undoubtedly arose from the unsettled state of the law in this area. Unlike the Fourth Circuit, several Courts of Appeal hold that objective reasonableness is a jury issue. *See, e.g.*, *Maestas v. Lujan*, 351 F.3d 1001, 1008-10 (10th Cir. 2003); *Fisher*

Qualified immunity is not a mere defense; it is instead "'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz,* 533 U.S. 194, 200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). As a result, both the Supreme Court and this Court repeatedly have "emphasized the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial." *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003); *see also Saucier*, 533 U.S. at 200-01.

The instant case did not involve any disputed issues of fact material to the ultimate legal question whether Officer Tou acted in an objectively reasonable manner. The parties agreed on what transpired; they disagreed only on what the facts meant. The district court therefore could have, and should have, dismissed Officer Tou as a defendant prior to trial.

---

*v. City of Memphis*, 234 F.3d 312, 317 (6th Cir. 2000); *Snyder v. Trepagnier*, 142 F.3d 791, 799-800 (5th Cir. 1998). Past decisions of this Court tended to favor judicial resolution of the objective reasonableness inquiry. *See, e.g.*, *Knussman v. Maryland*, 272 F.3d 625, 634 (4th Cir. 2001). However, as recently as last year this Court used language which implied that a jury could decide the ultimate issue in a qualified immunity case. *See Waterman v. Batton*, 393 F.3d 471, 477 n.7 (4th Cir. 2005) ("[T]he reasonableness itself — and specifically the question of what a reasonable jury could determine regarding reasonableness — is an issue that we consider de novo."). These decisions, when combined with pattern jury instructions on the topic of objective reasonableness, left the district courts and litigants with conflicting guidance as to who should decide what. It was only this Court's June 2005 decision in *Willingham* that fully and finally settled the issue in the Fourth Circuit.