**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 08-1105**

EARL F. COLE,

            Plaintiff - Appellee,

        v.

BUCHANAN COUNTY SCHOOL BOARD; STEVE HAMRO, III, Individually and in his official capacity as Chairman and member of the Buchanan County School Board; CLARENCE BROWN, JR., Individually and in his official capacity as a member of the Buchanan County School Board; BILL CRIGGER, II, Individually and in his official capacity as a member of the Buchanan County School Board; RHONDA MCCLANAHAN, Individually and in her official capacity as a member of the Buchanan County School Board,

            Defendants - Appellants.

Appeal from the United States District Court for the Western District of Virginia, at Abingdon. James P. Jones, Chief District Judge. (1:07-cv-00001-jpj-pms)

Argued: March 25, 2009                  Decided: May 14, 2009

Before DUNCAN, Circuit Judge, Robert J. CONRAD, Jr., Chief United States District Judge for the Western District of North Carolina, sitting by designation, and Thomas D. SCHROEDER, United States District Judge for the Middle District of North Carolina, sitting by designation.

Reversed and remanded by unpublished opinion. Judge Duncan wrote the opinion, in which Judge Conrad and Judge Schroeder joined.

**ARGUED:** Jim H. Guynn, Jr., GUYNN, MEMMER & DILLON, PC, Salem, Virginia, for Appellants.   Michael Allen Bragg, Abingdon, Virginia, for Appellee.  **ON BRIEF:** Elizabeth K. Dillon, GUYNN, MEMMER & DILLON, PC, Salem, Virginia, for Appellants.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

In October 2006, the Buchanan County School Board ("Board") voted to ban Earl F. Cole, a reporter, from Buchanan County school property with certain exceptions.  Cole brought a claim under 42 U.S.C. § 1983 against the Board and four of its individual members, alleging retaliation for the exercise of his First Amendment rights.  The individual Board members moved to dismiss based on qualified immunity.[1]  The district court denied their motion.  Because we hold that Cole's rights were not clearly established, we reverse.

                              I.

According to undisputed facts on the record, several incidents preceded the Board's decision to ban Cole from Buchanan County school property:

- In 2003, Cole entered an elementary school building and took photos during the school day without reporting to the principal's office.  Cole later claimed that he was on his way to sign in.  J.A. 65-66; 91.

- On the same visit, Cole interviewed one or more students in the school building during school hours.  J.A. 65-66;

_____

[1]The Board itself cannot claim qualified immunity.

3

91.   The assistant principal reported both of these incidents to the school administration.

- On October 2, 2006, the principal of another elementary school, Melanie Hibbitts, observed Cole, who had not signed in,[2] standing among the trees in front of the school during school hours.   When questioned by Ms. Hibbitts, Cole claimed he was there to photograph the fall decorations.   Several parents called the school to voice their concern about seeing Cole on the school

---

[2]The parties dispute whether the Board's visitor policy requires an individual to sign in when on school grounds, but not entering school buildings.   The official visitor policy of the Buchanan County School Board, policy KK, provides: "Visitors are welcome in the schools.   They must report to the administrative office for a pass.   Unauthorized persons . . . will be requested to leave school grounds by the building administrator."   J.A. 118.   Superintendent Justus stated that the policy applied to all school property (including grounds). The Board did allow community use of the track, and, apparently once school officials came to recognize parents, these individuals did not have to sign in to use it.   J.A. 123.

Signs at the schools announce the school visitor policies. These signs are posted at or near the school entrances.   The notice at one school states:  "All visitors must report to the school office upon entering the building."   J.A. 90 (capitalization omitted).   At another school, entrance to the building can only be gained through the use of an intercom, and the sign inside the entrance states:  "All visitors must report to the office."   J.A. 90 (capitalization omitted). Cole stated that he did not think that the Board required him to sign in if he was on school grounds but not entering school buildings. J.A. 90; see also J.A. 92.   For reasons we subsequently explain, this dispute does not affect our analysis.   See infra note 6 and accompanying text.

4

grounds with a camera when their children were being dropped off. Ms. Hibbitts made Superintendent Justus aware of the incident. J.A. 73-74.

- Later that same month, on October 13, 2006, a teacher saw Cole in the school's parking lot. When Ms. Hibbitts went out and questioned Cole, Cole claimed that he was there to re-take pictures of the fall decorations because the previous ones had not turned out. He had not signed in. He did not take any pictures of the decorations while Ms. Hibbitts was there. Parents again expressed concern about Cole's presence on school grounds. And Ms. Hibbitts again advised school administration of the incident. J.A. 74.

- On October 20, 2006, Cole published an article questioning why a Board member sent his child to a school outside the district he represented. The article included a photograph of the Board member dropping his child off at the school in question. J.A. 93. Cole had previously published other reports and opinions critical of the Board. J.A. 11.

- At least one Board member was aware that Cole had previously pleaded guilty to assault and battery. J.A. 71.

5

At its regularly scheduled meeting on October 23, 2006, the Board passed a resolution banning Cole from all Buchanan County school property. At a second meeting, on October 31, 2006, the resolution was amended. The amended resolution stated that Cole

> has been observed on school property on multiple occasions hiding around trees and/or bushes either loitering and/or taking photographs and has repeatedly ignored posted signs informing all visitors that they must report to the office upon arrival; and . . . many parents and teachers have expressed concern about Mr. Cole's actions as aforesaid, especially when children are present while school is in session.

J.A. 27. In the amended resolution, the Board stated that it sought "to protect the students it serves from the unauthorized entry of third parties upon its premises and the taking of photographs without their or their parent(s)' permission." J.A. 28. The Board resolved that Cole would be banned from school property "during operational hours while school is in session and students are present, except upon express written invitation or to attend a public board meeting or to exercise his right to vote."[3] Id.

Cole sued the Board and four of its members under 42 U.S.C. § 1983, alleging that the Board's ban was actually retaliation against him for exercising his First Amendment right to publish

---

[3]Cole addressed the Board at this meeting regarding the resolution. After Cole's comments, the Board adopted the amended resolution.

6

critical articles, including an article that questioned the decision of a Board member to send his child to an out-of-district school. The individual Board members moved to dismiss on summary judgment based on qualified immunity. The district court denied the motion, holding that the Board members were not protected by qualified immunity because Cole had established that the Board's actions violated Cole's First Amendment rights and that the rights infringed upon were clearly established. The Board members timely appealed.

## II.

We review de novo a denial of a motion for summary judgment based on qualified immunity. Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992). When a government official properly asserts qualified immunity, we have traditionally engaged in a two-step, sequential analysis. Under this analysis, we first look to the facts, viewed in the light most favorable to the nonmoving party, to determine if the defendant has violated the constitutional rights of the plaintiff (the "constitutional prong" of the qualified immunity analysis). Mazuz v. Maryland, 442 F.3d 217, 225 (4th Cir. 2006). If we determine that a constitutional right has been violated, only then do we assess whether the right was "clearly established" under existing law

(the "clearly established prong" of the qualified immunity analysis). Id.

The Supreme Court has recently abandoned the requirement that courts adhere to this rigid two-tiered approach. Pearson v. Callahan, 129 S. Ct. 808, 812 (2009). The Supreme Court's decision in Pearson allows courts to grant qualified immunity without first deciding whether a violation occurred so long as the right claimed to be violated was not clearly established. Id. We find such analytic flexibility to be particularly appropriate here and focus our consideration on the clearly established prong.[4]

---

[4]We note that the district court did not have the advantage of the Supreme Court's decision in Pearson when it engaged in the traditional two-step analysis. Still, we nevertheless are skeptical that Cole's First Amendment rights were in fact chilled, as required to establish a First Amendment retaliation claim. The following facts weigh against finding such chilling: (1) Cole owned the newspaper he wrote for and acknowledged that he could have assigned other reporters to cover stories requiring entry onto school property; (2) Cole remained free, consistent with the Board's prohibition, to watch, or take photographs, from the public spaces outside the school grounds; (3) Cole was in no way inhibited by the prohibition from interviewing individuals associated with the school off school property or when school was not in session; and (4) reporters in the "rough and tumble" political arena do not necessarily have a remedy at law when government officials are unwilling to confer information, see Baltimore Sun v. Ehrlich, 437 F.3d 410, 419 (4th Cir. 2006). As our decision is based on the fact that the contours of Cole's right were not clearly established, we need not definitively resolve this issue of whether his First Amendment rights were chilled.

Generally, government officials performing discretionary functions[5] are granted qualified immunity and are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The right that an official is alleged to have violated must be "clearly established" not merely as a general proposition (in the way, say, the right to due process is clearly established), but "in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987); see also Saucier v. Katz, 533 U.S. 194, 202 (2001) (rev'd in part on other grounds); Cloaninger ex rel. Estate of Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009). Stating the right in question at too broad a level of generality would destroy the balance that Supreme Court case law has sought to establish "between the interests in vindication of citizens' constitutional rights and . . . public officials' effective performance of their duties by making it impossible for officials reasonably to anticipate when their conduct may give

---

[5]Here, it is uncontested that the Board, in adopting the resolution banning Cole from school property, was engaged in such a discretionary function.

9

rise to liability for damages." Anderson, 483 U.S. at 639 (citations and quotations omitted).

The "clearly established" prong of the qualified immunity analysis turns on "the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Wilson v. Layne, 526 U.S. 603, 614 (1999) (quotations and citations omitted). "[I]n the light of pre-existing law, the unlawfulness must be apparent." Anderson, 483 U.S. at 640. A defense of qualified immunity, therefore, protects "all but the plainly incompetent or those who knowingly violate the law." Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Having outlined the relevant portion of the qualified immunity analysis, we now consider the state of the law regarding the authority of school boards to control access to school grounds. Such an analysis is necessary to determine the objective reasonableness of the Board's conduct. Virginia law vests title to school property in the school board. Va. Code Ann. § 22.1-125. It further provides that, beyond a school's educational mission, the school board is authorized to designate the uses to which school property may be put. See id. §§ 22.1-131 & 22.1-132. Virginia law specifically authorizes a school board to restrict access to school property, providing in part

10

that "[i]t shall be unlawful for any person . . . to enter upon or remain upon any . . . school property in violation of (i) any direction to vacate the property by a person authorized to give such direction or (ii) any posted notice which contains such information, posted at a place where it reasonably may be seen." Va. Code Ann. § 18.2-128. Additionally, Virginia's general trespass statute applies to school property. See Pleasants v. Commonwealth of Va., 203 S.E.2d 114, 117 (Va. 1974) (applying the predecessor general trespass statute to school property). This statute provides in part that "[i]f any person without authority of law goes upon or remains upon the lands, buildings or premises of another, or any portion or area thereof, [i] after having been forbidden to do so, either orally or in writing, by the owner, lessee, custodian or other person lawfully in charge thereof, or [ii] after having been forbidden to do so by a sign or signs posted by such persons, . . . he shall be guilty of a Class 1 misdemeanor."[6] Va. Code Ann. §

---

[6]Both Va. Code Ann. § 18.2-128 and Va. Code Ann. § 18.2-119 frame the school board's authority in the disjunctive (i.e., the authority can be exercised through either direct communication or the posting of signs). This phrasing renders any discrepancies or disagreements about the posted notices and the extent of school property they covered not germane to our analysis of the Board's authority to issue a directive to Cole not to enter the school grounds.

18.2-119.  Because title is vested in the school board, the board is the "owner" or "custodian" of school property.

A school board also has inherent authority to restrict access to the property that it controls.  The Supreme Court, citing a long line of precedent, has held that "[t]here is no question that the District, like the private owner of property, may legally preserve the property under its control for the use to which it is dedicated."[7]  Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 390-91, (1993).  Members of the public do not have any constitutional right of access to public schools, Vukadinovich v. Bd. of Sch. Trs. of Mich. City Area Schs., 978 F.2d 403, 409 (7th Cir. 1992), and public ownership does not automatically open up school grounds to the public, see United States v. Kokinda, 497 U.S. 720, 725 (1990); Embry v. Lewis, 215 F.3d 884, 888 (8th Cir. 2000).  School officials have broad authority and responsibility for assuring that individuals

_____

[7]Since Cole is not alleging direct infringement of his First Amendment rights by the Board's ban (i.e., he was not seeking access to the school grounds in order to engage in protected speech activity), we need not enter into a forum analysis.  We note, however, that public schools are not deemed public forums simply because they are owned by the government.  See United States v. Kokinda, 497 U.S. 720, 725 (1990).  For school facilities to become public forums, school authorities must have opened those facilities for "indiscriminate use by the general public."  Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988).  With the possible exception of the school track, there is no evidence here that school officials opened up the school grounds for indiscriminate use by the general public.

12

conduct themselves appropriately while on school grounds. Lovern v. Edwards, 190 F.3d 648, 655 (4th Cir. 1999). A school board's authority encompasses the authority to remove or bar from entry an individual who threatens the safety of students or staff, or who disrupts the orderliness of the educational process. See Carey v. Brown, 447 U.S. 455, 470-71, (1980) (holding that the Constitution does not leave state officials powerless to prevent conduct that disturbs the tranquility of schools); Goss v. Lopez, 419 U.S. 565, 582 (1975) (holding that a school official's determination of the existence of an ongoing threat of disruption of the academic process can justify immediately removing a person from school property); Hall v. Bd. of Sch. Comm'rs of Mobile County, Ala., 681 F.2d 965, 966 (5th Cir. 1982) (holding that, in considering visitation policies, the court shared "the school officials' basic concern that school administrators must have wide latitude in formulating and administering rules and regulations necessary to promote safety, discipline, order and the appropriate atmosphere for the educational goals of the school"). In carrying out its mandate to promote safety and order, therefore, a school board has broad authority to restrict access to school grounds.

III.

Having considered the applicable legal framework, we turn to the district court's decision here. The district court stated that, under the clearly established prong of the qualified immunity analysis, "the appropriate inquiry is whether a reasonable school board member would have understood that it was unlawful to retaliate against a critical member of the local press by banning him from school property otherwise open to the public." J.A. 104. The district court concluded that the conduct of the Board violated Cole's clearly established constitutional right when articulated in that fashion.

However, the district court improperly framed the issue. The appropriate inquiry here is whether a reasonable Board member could have believed that banning Cole from the Buchanan County school grounds was lawful, in light of clearly established law and the information Board members possessed. Cf. Anderson, 483 U.S. at 641 ("The relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed Anderson's warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed.").

Statutory law and judicial precedent compel the conclusion that the Board has wide latitude in making determinations about

14

access to school grounds. See Va. Code Ann. § 18.2-128; Carey, 447 U.S. at 470-71; Lovern, 190 F.3d at 655. Such broad discretion is necessary for the Board to carry out its mandate to protect students and ensure the proper functioning of the educational system. See Lovern, 190 F.3d at 655; Hall, 681 F.2d at 966. The Board, at the time it issued the resolution banning Cole from school grounds, possessed the following information: (1) parents had expressed concerns on multiple occasions about Cole's presence on the school grounds with a camera while their children were present; (2) Cole had entered a school building during school hours while students were present and had taken photographs; (3) Cole had interviewed one or more students in school while school was in session without permission; (4) Cole had written an article that was arguably critical of a Board member as well as other critical pieces; (5) Cole's presence on the school grounds raised concerns among school administrators, and at least twice the principal of one school had questioned him about his presence on the grounds; and (6) at least one Board member was aware of Cole's past conviction for assault and battery. Given the breadth of the Board's authority to control access to school grounds and the factual information the Board possessed at the time it passed the resolution at issue, a reasonable Board member may well have believed it was his or her duty to ban Cole from school grounds in order to protect both

15

the safety of the students and the integrity of the educational process.  Under the circumstances here, then, a reasonable Board member certainly could have believed that banning Cole from school property was lawful.

IV.

Because the conduct complained of did not violate a clearly established right, we reverse the district court's judgment and remand for dismissal of the action against the individual Board members.

<u>REVERSED AND REMANDED</u>

16